## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ALICIA EVERETTE,** | * | |
| **3705 Wildor Avenue** | | |
| **Baltimore, Maryland 21244** | * | |
| | | |
| *Plaintiff,* | * | |
| | | |
| **v.** | * | **Civil Action: 1:15-cv-1261** |
| | | |
| **JOSHUA MITCHEM** | * | |
| **4551 West 107th Street** | | |
| **Overland Park, KS 66207** | * | |
| | | |
| **and** | * | |
| | | |
| **JEREMY D. SHAFFER** | * | |
| **3543 Broadway** | | |
| **Kansas City, MO 64111** | * | |
| | | |
| **and** | * | |
| | | |
| **SCOTT A. TUCKER** | * | |
| **5600 West 97th Street** | | |
| **Overland Park, KS 66207** | * | |
| | | |
| **and** | * | |
| | | |
| **NDG FINANCIAL** | * | |
| **CORPORATION** | | |
| **Suite 200 - 15225 104th Ave.** | * | |
| **Surrey, BC** | | |
| **V3R 6Y8 Canada** | * | |
| | | |
| **and** | * | |
| | | |
| **MOBILOANS, LLC** | * | |
| **151 Melacon Rd.** | | |
| **Marksville, LA 71351** | * | |
| | | |
| **and** | * | |

1

**RIVERBEND FINANCE, LLC**      \*
**P.O. Box 557**
**Hays, MT 59527,**      \*

   *Defendants.*      \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Now comes Plaintiff Alicia Everette, by and through her attorneys, E. David Hoskins, Esq., Max F. Brauer, Esq., and The Law Offices of E. David Hoskins, LLC, and for her Complaint alleges as follows:

## INTRODUCTION

1.      This lawsuit seeks to recover damages arising from unconscionable, unlicensed, usurious payday loans made by Defendants to Plaintiff and the class of Marylanders she seeks to represent.

2.      The payday lenders named as Defendants in this complaint are alleged to have engaged in sham "rent-a-tribe" schemes. Under a "rent-a-tribe" scheme, payday lenders offer compensation to Native American tribes to allow the lender to organize under the tribe's name, while interests outside the tribe maintain functional control of the entity. The illegal loans at issue in this Complaint are not made on Native American reservations and have virtually no connection to Native American reservations. Through "rent-a-tribe," payday lenders attempt to escape prosecution for their illegal activities by cloaking themselves in tribal sovereign immunity. However, tribal sovereign immunity cannot apply to these payday lenders because they are separate and distinct from

the tribe, not controlled by the tribe or closely linked to the tribe, provide the tribe with little or no economic benefit, and do not further any federal Indian law or policy intended to promote tribal self-determination.

3.     Typically, a payday lender will reorganize an existing loan operation under a tribe's name in exchange for monthly payments, typically a small percentage of monthly profits. Native American tribes seldom get a significant cut of the amount of money generated by this arrangement.

4.     Most payday lenders lack a physical presence on tribal land. Instead, they operate from call centers outside of the reservation.

5.     The number of companies seeking to organize under tribal law further evidences the existence of the "rent-a-tribe" model. Payday loan consultants acknowledge a recent boom in this model. *See* Jessiva Silver-Greenberg, *Payday Lenders Join With Indian Tribes*, THE WALL STREET JOURNAL, Feb. 10, 2011, *available at* http://www.wsj.com/articles/SB10001424052748703716904576134304155106320.

6.     Various web-based payday loan consultants such as www.Consultants4Tribes.com even offer instructions to payday lenders, advising them how to organize with Native American tribes to evade state regulation efforts. These sites highlight the absurdity of the "rent-a-tribe" practice.

7.     The irony is that "rent-a-tribe" lenders claim to be helping impoverished Native American tribes while the illegal loans themselves disproportionately affect minorities. In reality, the tribes gain little economic

benefit and have little control over practices. Payday lenders effectively pay off certain historically oppressed minorities in order to hurt other historically oppressed minorities. In other words, they "rob Peter and pay Paul peanuts." These loans benefit chiefly the unscrupulous payday lending industry at the expense of plaintiff and the class she seeks to represent. "Rent-a-tribe" is simply a naked attempt to dodge liability for illegal payday lending.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1693m(g), which provides that an action under EFTA may be brought in any court of competent jurisdiction.

9.    Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367.

10.    Venue lies properly in this District pursuant to 28 U.S.C. § 1391(b), in that the Defendants transact business in this District and a substantial portion of the acts that give rise to the claim occurred within this District. Additionally, Plaintiff resides within the District of Maryland.

## PARTIES

11.    Plaintiff Alicia Everette ("Ms. Everette") is and was at all times a "consumer" as defined in the MCPA, Md. Code Ann., Com Law, § 13-101(c)(1) because she is a recipient of consumer credit and a person allegedly obligated to pay any debt, in this case payday loans used to make ends meet with personal and household bills, food and other necessities when Ms. Everette was short on cash.

Ms. Everette is and was at all times a "person" as that term is defined by the MCDCA and MCPA, Md. Code Ann., Com Law, §§13-101(h) and 14-201(d).

### a.   Joshua Mitchem and Jerry D. Shaffer

12.   Defendants Joshua Mitchem ("Mitchem") and Jeremy D. Shaffer ("Shaffer") are natural persons who reside in Kansas. Defendants Mitchem and Shaffer do business as "Action PayDay," "Action PDL Services," "Bottom Dollar PayDay," and "BD PDL Services" – all of which are fictitious entities. Defendants Mitchem and Shaffer are not licensed as either a consumer loan lender or an installment loan lender in Maryland. At all times material to this complaint, acting alone or in concert with others, Defendants Mitchem and Shaffer advertised, marketed, distributed, collected or sold usurious payday loans to Plaintiff and the class she seeks to represent in Maryland. Defendants Mitchem and Shaffer acted as a "collector" as defined by Md. Code Ann., Com. Law, § 14-201(b) of the MCDCA because they collected and attempted to collect from Plaintiff an alleged debt arising out of a consumer transaction.

13.   Defendants Mitchem and Shaffer are also the operators and effective owners of FSST Financial Services, LLC, an entity claiming to be a tribal lending entity organized under the laws of the Flandreau Santee Sioux Tribe. On information and belief, however, it is actually owned and controlled by Defendants Joshua Mitchem and Jeremy D. Shaffer.

### b.   Scott A. Tucker

14.   Defendant Scott A. Tucker ("Tucker") is a natural person who resides

in Overland Park, Kansas. Defendant Tucker is not registered to do business in Maryland and is not licensed as either a consumer loan lender or an installment loan lender in Maryland. At all times material to this complaint, acting alone or in concert with others, Tucker advertised, marketed, distributed, collected or sold usurious payday loans to Plaintiff and the class she seeks to represent in Maryland. Defendant Tucker acted as a "collector" as defined by Md. Code Ann., Com. Law, § 14-201(b) of the MCDCA because it collected and attempted to collect from Plaintiff and the class she seeks to represent an alleged debt arising out of a consumer transaction.

15.     Defendant Tucker attempts to shield himself from liability for the illegal conduct alleged herein through the use of corporate entities over which he exercises complete control, including but not limited to AMG Capital Management, LLC; Partner Weekly, LLC; Black Creek Capital, LLC; and Broadmoor Capital Partners, LLC. Defendant None of these entities are registered to do business in Maryland. None of these entities is licensed as either a consumer loan lender or an installment loan lender in Maryland. Acting in concert with these entities, Defendant Tucker advertised, marketed, distributed, collected or sold usurious payday loans to Plaintiff and the class she seeks to represent in Maryland.

16.     Tucker is a signatory on the accounts of each of these corporate entities.

17.     Defendant Tucker is the manager of Broadmoor Capital Partners,

LLC; Black Creek Capital, LLC, and Level 5 Motorsports, LLC.

18.    Defendant Tucker is the president, secretary, treasurer, and director of Black Creek Capital Corporation.

19.    Defendant Tucker is also the operator and effective owner of AMG Services, Inc., Tribal Financial Services and MNE Services, Inc., entities claiming to be organized under the laws of the Miami Tribe of Oklahoma. Using these corporate and tribal lending entity fronts, Defendant Tucker provides usurious payday loans through fictitious entities named "AmeriLoan" and "UnitedCashLoans."

20.    Defendant Tucker claims to be a mere"employee" of AMG Services, Inc.

21.    At all times material to this complaint, acting alone or in concert with others, Defendant Tucker has formulated, directed, controlled, had authority to control, participated in the acts and practices of AMG Services, Inc., Tribal Financial Services, MNE Services, Inc., AMG Capital Management, LLC, Level 5 Motorsports, LLC, LeadFlash Consulting, LLC, PartnerWeekly, LLC, Black Creek Capital Corp, Black Creek Capital, LLC, and Broadmoor Capital Partners, LLC.

22.    In this manner, Defendant Tucker has engaged in the acts, practices and violations of law alleged below with respect to "UnitedCashLoans" and "AmeriLoan." Defendant Tucker has conducted the business practices described below through an interrelated network of companies that have common

ownership, business functions, and employees and have commingled funds. Defendant Tucker has formulated, directed, controlled, had the authority to control, had knowledge of, or participated in the acts and practices of these entities to create a common enterprise.

### c.   NDG Financial Corporation

23.    Defendant NDG Financial Corporation ("NDG") is a foreign Canadian corporation. Defendant NDG is the parent corporation of Blizzard Interactive and ECare Contact Centers. Defendant NDG at times does business under the fictitious name "CashTaxi.com," among others. Defendant NDG is not registered to do business in Maryland and is not licensed as either a consumer loan lender or an installment loan lender in Maryland. At all times material to this complaint, acting alone or in concert with others, Defendant NDG advertised, marketed, distributed, collected or sold usurious payday loans to Plaintiff and the class she seeks to represent in Maryland. Defendant NDG acted as a "collector" as defined by Md. Code Ann., Com. Law, § 14-201(b) of the MCDCA because it collected and attempted to collect from Plaintiff an alleged debt arising out of a consumer transaction.

24.    Defendant NDG is also the operator and effective owner of Oasis Funds, LLC, an entity claiming to be a tribal lending entity organized under the laws of the Lac Courte Oreilles Bank of Lake Superior Chippewa Indians.

25.    At all times material to this complaint, acting alone or in concert with others, Defendant NDG has formulated, directed, controlled, had authority

to control, participated in the acts and practices of Oasis Funds, LLC, Blizzard Interactive, and ECare Contact Centers.

26.    In this manner, Defendant NDG has engaged in the acts, practices and violations of law alleged below with respect to "CashTaxi.com." Defendant NDG has conducted the business practices described below through an interrelated network of companies that have common ownership, business functions, and employees and have commingled funds. Defendant NDG has formulated, directed, controlled, had the authority to control, had knowledge of, or participated in the acts and practices of these entities to create a common enterprise.

### d.    MobiLoans, LLC

27.    Defendant MobiLoans, LLC ("MobiLoans") a foreign limited liability company that does business under the name "MobiLoans." Defendant MobiLoans is not registered to do business in Maryland and is not licensed as either a consumer loan lender or an installment loan lender in Maryland. At all times material to this complaint, acting alone or in concert with others, Defendant MobiLoans advertised, marketed, distributed, collected or sold usurious payday loans to Plaintiff and the class she seeks to represent in Maryland. Defendant acted as a "collector" as defined by Md. Code Ann., Com. Law, § 14-201(b) of the MCDCA because it collected and attempted to collect from Plaintiff an alleged debt arising out of a consumer transaction.

### e.      **Riverbend Finance, LLC**

28.      Defendant Riverbend Finance, LLC    ("Riverbend") is a foreign limited liability company that does business under the name "Riverbend Cash." Defendant Riverbend is not registered to do business in Maryland and is not licensed as either a consumer loan lender or an installment loan lender in Maryland. At all times material to this complaint, acting alone or in concert with others, Defendant Riverbend advertised, marketed, distributed, collected or sold usurious payday loans to Plaintiff and the class she seeks to represent in Maryland. Defendant acted as a "collector" as defined by Md. Code Ann., Com. Law, § 14-201(b) of the MCDCA because it collected and attempted to collect from Plaintiff an alleged debt arising out of a consumer transaction.

## FACTUAL ALLEGATIONS

### a.      **"Action PayDay" and "Bottom Dollar PayDay"**

29.      "Action PayDay" and"ActionPayDay.com" are purportedly owned and operated by FSST Financial Services, LLC, which is allegedly a tribal lending entity wholly owned by the Flandreau Santee Sioux Tribe, and list a South Dakota P.O. Box as an address.

30.      "Bottom Dollar PayDay" and"BottomDollarPayday.com" are also purportedly owned and operated by FSST Financial Services, LLC.

31.      However, "Action PayDay" and "Bottom Dollar PayDay" are actually owned and operated by Defendants Mitchem and Shaffer. Each of these fictitious entities does business as, including but not limited to, BD PDL Services, LLC,

10

International Equities Group, LLC, Paradise Cash Advance, Action PDL Services, PDL Support, LLC, Platinum B Services, LLC, and PDL Support Services, LLC.

32.     Defendants Mitchem and Shaffer own and control the websites and business operations of "Action PayDay" and "Bottom Dollar PayDay."

33.     The website www.bottomdollarpayday.com is registered to Josh Mitchem, 3543 Broadway, Kansas City, MO 64111.

34.     At one time, Defendants Mitchem and Shaffer purportedly created entities located in the island nation of Nevis. However, this smoke and mirrors tactic failed to insulate Defendants Mitchem and Shaffer from regulatory actions from numerous state attorneys general. These actions have failed to deter Defendants Mitchem and Shaffer, who continue to profit widely on usurious loans.

35.     Defendants Mitchem and Shaffer now have switched to a different smoke and mirrors technique, Rent-a-Tribe. On information and belief, "Action PayDay" and "Bottom Dollar PayDay" are not wholly owned and operated by the Flandreau Santee Sioux Tribe or any tribal lending entity. Rather, Defendants Mitchem and Shaffer pay the Flandreau Santee Sioux to use their name in order to cloak their unscrupulous lending activities in the guise of tribal sovereign immunity.

36.     On information and belief, the vast majority of the economic benefit of "Action PayDay" and "Bottom Dollar PayDay" goes to Defendants Mitchem and Shaffer.

11

37. On information and belief, "Action PayDay" and "Bottom Dollar PayDay" do not provide for tribe's autonomy and economic development. Rather, they mostly profit Defendants Mitchem and Shaffer in continuing their unconscionable lending practices.

38. On information and belief, "Action PayDay" and "Bottom Dollar PayDay" are not operated or controlled by the tribe. The tribe makes no significant business, financial, personnel, or management decisions. Rather, virtually all decisions are made by Defendants Mitchem and Shaffer.

39. On information and belief, FSST Financial Services, LLC does not hold property in its own name. Nor is FSST Financial Services, LLC closely linked through the governance structure of the tribe. Given its relationship with Defendants Mitchem and Shaffer, the entity is legally separate and distinct from the tribe, and it is organized for commercial purposes that provide little benefit, if any, to the tribe. No federal Indian law policy intended to promote tribal self-determination is furthered through the existence of FSST Financial Services, LLC.

40. "Action PayDay" and "Bottom Dollar PayDay" claim that they do not lend to Maryland residents.

41. "Action PayDay" and "Bottom Dollar Payday" claim that they do not lend to Maryland residents because they know that payday loans are illegal in Maryland.

42. "Action PayDay" and "Bottom Dollar Payday" claim that they do not

lend to Maryland residents because they know that they do not have a license to make loans in Maryland pursuant to either Md. Code, Fin. Inst. §§ 11-204 or 11-302.

43.    At the beginning of 2013, Plaintiff Alicia Everette obtained payday loans from both "Action PayDay" and "Bottom Dollar PayDay" in Maryland even though neither or these entities are licensed to make loans in Maryland.

44.    Plaintiff obtained these loans in Maryland by using a computer in Maryland to access the interactive websites for "Action PayDay," www.actionpayday.com, and "Bottom Dollar PayDay," www.bottomdollarpayday.com. These websites have online loan applications, and allow users to engage in online chat with "Action PayDay" and "Bottom Dollar PayDay" representatives. In fact, the chat function is an automatic popup.

45.    Neither website conspicuously discloses that either "Action PayDay" or "Bottom Dollar PayDay" are Native American lenders subject to sovereign immunity. At the bottom of each website, hidden in small and obscure fine print, is a disclosure claiming that "Action PayDay" and "Bottom Dollar PayDay" are owned by FSST Financial Services, LLC, which the fine print alleges is wholly owned by the Flandreau Santee Sioux Tribe. However, the disclosure makes no mention of sovereign immunity, and makes no indication that Maryland residents would not be able to seek recourse under Maryland laws for the usurious and unlicensed loans that "Action PayDay" and "Bottom Dollar PayDay" made in Maryland.

46.     These loans were for under $6,000.

47.     The interest rate for these loans exceeded the maximum interest rate allowed in Maryland pursuant to Md. Code, Com. Law § 12-103, which is 24 percent.

48.     Alicia Everette had multiple small loans with "Action PayDay" and "Bottom Dollar PayDay." She paid at least $3,815 over the course of 2013 on these loans. For example, during 2013, Alicia Everette borrowed approximately $1,000 from "Bottom Dollar PayDay," including two $500 loans, one rolled into another in order to maximize the lenders' profits and Ms. Everette's expense. Ms. Everette paid approximately $2,552.50 on these loans. She did not pay these loans off, and a balance was still due. If the loans had been paid off, the simple interest rate would have been a usurious 27 percent. However, because the loans were not paid off, the rate was actually much higher, on information and belief far in excess of 50 percent if not 100 percent.

49.     On information and belief, "Action PayDay" and "Bottom Dollar PayDay" conditioned the extension of credit on repayment by means of preauthorized electronic fund transfers.

50.     Since "Action PayDay" and "Bottom Dollar PayDay" or any related entity lacked a license to lend in Maryland, and because the loans are usurious, these loans are void and unenforceable.

**b.     UnitedCashLoans and AmeriLoan**

51.     "UnitedCashLoans" and "AmeriLoan" are fictitious entities

14

purportedly owned and operated by MNE Services, Inc., and/or Tribal Financial Services, and or AMG Services, Inc.

52.    However, "UnitedCashLoans" and "AmeriLoan" are actually owned, operated and controlled by Defendant Tucker through a web of corporate entities.

53.    Through these entities Defendant Tucker has attempted to skirt liability for his illegal and unlicensed payday lending activities. Defendant Tucker directs payments to the Miami Tribe of Oklahoma of a nominal fee to use their name in order to cloak his unscrupulous lending activities under the guise of tribal sovereign immunity.

54.    "UnitedCashLoans" and "AmeriLoan" were originally registered to Defendant Scott A. Tucker to advertise and market payday loans several years before these names became affiliated with MNE Services, Inc., and/or Tribal Financial Services, and or AMG Services, Inc. In July 2008, MNE Services, Inc., and/or Tribal Financial Services, and or AMG Services, Inc. entered into management agreements with a Tucker-controlled company, N.M. Service Corp (NMS) to direct and operate their lending activities. Defendant Tucker, however, totally controls and operates "UnitedCashLoans" and "AmeriLoan."

55.    None of the business operations of "UnitedCashLoans" or "AmeriLoan" take place on tribal land. Rather, they occur in Overland Park, Kansas.

56.    On information and belief, the vast majority of the economic benefit of "UnitedCashLoans" and "AmeriLoan" ultimately goes to Defendant Tucker.

The tribal entities receive only one percent of the gross revenues of "UnitedCashLoans" and "AmeriLoan" while Defendant Tucker retains the "net cash flow of the Lending Business."

57.   On information and belief, "UnitedCashLoans" and "AmeriLoan" do not provide for the Miami Tribe of Oklahoma's autonomy and economic development. Rather, they mostly profit Defendant Tucker.

58.   In particular, "UnitedCashLoans" and "AmeriLoan" fund the professional race car driving career of Defendant Tucker. The entries controlled and owned by Defendant Tucker persistently commingle funds, many of which are ultimately funneled to his auto racing team, Level 5 Motorsports, LLC.

59.   Two of the alleged tribal entities gave $500 campaign donations to a local prosecutor in Defendant Tucker's hometown.

60.   AMG Services, Inc. operates out of an office complex in Overland Park, Kansas, the same office that Tucker lists as his own in Securities and Exchange Commission filings.

61.   AMG Serivices, Inc. also paid the property tax on Defendant Scott A. Tucker's $8 million vacation retreat in Aspen, Colorado.

62.   Tucker and his brother Blaine Tucker are the only two people able to sign for the bank accounts of MNE Services, Inc., and/or Tribal Financial Services, and or AMG Services, Inc. according to bank records.

63.    Tucker and his brother Blaine Tucker are the only two people able to sign for the bank accounts of Broadmoor Capital Partners, LLC; Black Creek

Capital, LLC, and Level 5 Motorsports, LLC.

64.    On information and belief, "UnitedCashLoans" and "AmeriLoan" are not operated or controlled by the Miami Tribe of Oklahoma. The Miami Tribe of Oklahoma makes no significant business, financial, personnel, or management decisions. Rather, virtually all decisions are made by Defendant Tucker.

65.    The Miami Tribe of Oklahoma has its own economic sub-division, Miami Nation Enterprises. According to its website, www.mn-e.com, Miami Nation Enterprises is a political and economic subdivision of the Miami Tribe of Oklahoma created by Tribal leadership to pursue economic development opportunities for the good of the Miami Nation and its citizens. However, "UnitedCashLoans," "AmeriLoan," and MNE Services, Inc., Tribal Financial Services, and AMG Services, Inc. do not appear anywhere on the Miami Nation Enterprises website as companies of Miami Nation Enterprises or the Miami Tribe of Oklahoma.

66.    On information and belief, the Miami Tribe of Oklahoma is not subject to any potential liability for the acts and practices of "UnitedCashLoans" and "AmeriLoan."

67.    MNE Services, Inc., Tribal Financial Services, and AMG Services, Inc. do not hold tribal property in their own name. Nor are they closely linked through the governance structure of the Miami Tribe of Oklahoma.

68.    Given their relationship with Defendant Tucker, MNE Services, Inc., Tribal Financial Services, and AMG Services, Inc. are legally separate and distinct

17

from the Miami Tribe of Oklahoma, and are organized for commercial purposes that provide little benefit, if any, to the tribe. No federal Indian law policy intended to promote tribal self-determination is furthered through the existence of MNE Services, Inc., Tribal Financial Services, and AMG Services, Inc.

69.    During 2013, Plaintiff Alicia Everette obtained payday loans from both "AmeriLoan" and "UnitedCashLoans" which she partially paid.

70.    Plaintiff obtained these loans in Maryland by using a computer in Maryland to access the interactive websites for "AmeriLoan," https:// ameriloan.com, and "UnitedCashLoans," https://unitedcashloans.com. These websites have online loan applications, and allow users to engage in online chat with "AmeriLoan" and "UnitedCashLoans" representatives. In fact, the chat function is an automatic popup.

71.    Neither website conspicuously discloses that either "AmeriLoan" or "UnitedCashLoans" are Native American lenders subject to sovereign immunity. At the bottom of each website, hidden in small and obscure fine print, is a disclosure that "AmeriLoan" and "UnitedCashLoans" are owned by MNE Services, Inc., which the fine print alleges is a sovereign tribal lending entity wholly owned by the Miami Tribe of Oklahoma. However, the disclosure makes no mention of sovereign immunity, and makes no indication that Maryland residents would not be able to seek recourse under Maryland laws for the usurious and unlicensed loans that "AmeriLoan" and "UnitedCashLoans" made in Maryland.

72.     These loans were for under $6,000.

73.     The interest rate for the subject loan exceeded the maximum interest rate allowed in Maryland pursuant to Md. Code, Com. Law § 12-103, which is 24 percent. On information and belief, the interest rate exceeded at least 100 percent.

74. On information and belief, "AmeriLoan" and "UnitedCashLoans" conditioned the extension of credit on repayment by means of preauthorized electronic fund transfers.

75.     Since "AmeriLoan" and "UnitedCashLoans" or any related entity lacked a license to lend in Maryland, and because the loans are usurious, these loans are void and unenforceable.

### c.     CashTaxi.com

76.     "CashTaxi.com" a/k/a "Cash Taxi" is purportedly owned and operated by Oasis Funds, LLC, which is allegedly a tribal lending entity wholly owned by the Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

77.     However, "CashTaxi.com" is actually owned and operated by Defendant NDG. On information and belief, Defendant NDG pays the Lac Courte Oreilles Bank of Lake Superior Chippewa to use the tribe's name in order to cloak their unscrupulous lending activities in the guise of tribal sovereign immunity.

78.     Defendant NDG concealed the true identity of who registered the website for "CashTaxi.com," listing the registrant's name as "Privacy Hero, Inc.," with an address in Barbados.

79.   However, Plaintiff was given the address of Blizzard Interactive when she inquired about her loan with "CashTaxi.com."

80.   Defendant NDG and Blizzard Interactive and ECare Contact Centers are all controlled by Jeremy Sabourin ("Sabourin") and Kimberley DeThomas ("DeThomas"). DeThomas is the chief executive officer of Defendants NDG and ECare Contact Centers. Sabourin is the chief operating officer of Defendant NDG and ECare Contact Centers. Sabourin is also listed prominently on the Blizzard Interactive website. Defendant NDG also claims on its website to be the parent company of ECare Contact Centers and Blizzard Interactive.

81.   Defendant NDG advertises on its website that it provides full turn-key business support systems for those in "consumer online lending."

82.   Defendant NDG claims one of its company core values is to "Give to Those Less Fortunate. Because it's the right thing to do." However, the only thing that Defendant NDG actually "gives" is usurious payday loans.

83.   Blizzard Entertainment specializes in the online finance industry, specifically "short-term credit" and seeks to buy "Payday Traffic."

84.   ECare Contact Centers admits that it originally provided payday loans throughout Canada, but now claims focuses only on the "service and support arena" of payday lending.

85.   Acting through Blizzard Entertainment and ECare Contact Centers, Defendant NDG provides operational, human resource, marketing, business technology, and finance/accounting for "CashTaxi.com."

86.     Conversely, little (if any) public mention of an affiliation between Oasis Funds, LLC, "CashTaxi.com," and the Lac Courte Oreilles Band of Lake Superior Chippewa Indians exist. The Lac Oreilles Tribal Government makes no mention of "CashTaxi.com" on its website.

87.     In fact, the Lac Courte Oreilles Band of Lake Superior Chippewa Indians appears not to promote or endorse predatory payday loans such as those offered by "CashTaxi.com." The Lac Courte Oreilles Band of Lake Superior Chippewa Indians featured prominently in a 2008 United States Senate hearing before the Committee on Indian Affairs. The hearing called "Predatory Lending in Indian Country" addressed predatory loans made to Native Americans on reservations and touted the Lac Courte Oreilles Federal Credit Union's "GOOD loan" ("Get Out Of Debt"), as an example of a responsible lending alternative to high interest payday loans that plague many Native American communities. With this program, the Lac Courte Oreilles Federal Credit Union's "goal is not to make a lot of money, but to establish a healthy relationship with that borrower."

88.     On information and belief, the vast majority of the economic benefit of "CashTaxi.com" goes to Defendant NDG.

89.     On information and belief, "CashTaxi.com" does not provide for the autonomy and economic development of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians. Rather, "CashTaxi.com" mostly profits Defendant NDG.

90.     On information and belief, "CashTaxi.com" is not operated or

controlled by the Lac Courte Oreilles Band of Lake Superior Chippewa Indians. The tribe makes no significant business, financial, personnel, or management decisions. Rather, virtually all decisions are made by Defendant NDG.

91.     On information and belief, Oasis Funds, LLC does not hold property in its own name. Nor is Oasis Funds, LLC closely linked through the governance structure of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

92.     Given the relationship of "CashTaxi.com" to Defendant NDG, Oasis Funds, LLC is legally separate and distinct from the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, and it is organized for commercial purposes that provide little benefit, if any, to the Lac Courte Oreilles Band of Lake Superior Chippewa Indians. No federal Indian law policy intended to promote tribal self-determination is furthered through the existence of Oasis Funds, LLC.

93.     On or about November 26, 2013, Plaintiff Alicia Everette obtained  a payday loan from "CashTaxi.com" in Maryland even though none of the applicable Defendants are licensed to make loans in Maryland.

94.     Plaintiff obtained this loan in Maryland by using a computer in Maryland to access the interactive website for "CashTaxi.com," www.cashtaxi.com. This website has online loan applications, customer login, and allows users to engage in online chat with "CashTaxi.com" representatives.

95.     Neither website conspicuously discloses that "CashTaxi.com" is subject to sovereign immunity. At the bottom of each website, hidden in small and obscure fine print, is a disclosure that Oasis Funds, LLC does business as

CashTaxi.com and that it is owned and controlled by the Lac Courte Oreilles Band of Lake Superior Chippewa Indians. If one were to click through enough links on the "CashTaxi.com" website, one would eventually find a long boilerplate "Terms and Conditions" at the bottom of a "Terms of Use" link that claims in this obscure fine print to preserve sovereign immunity. However, there is no reason that a consumer or Plaintiff would have seen this page in order to apply for a payday loan. In addition, the "Terms and Conditions" do not state  that Maryland residents would not be able to seek recourse under Maryland laws for the usurious and unlicensed loans that "CashTaxi.com" made in Maryland.

96.    Plaintiff's loan was for $300. She repaid the loan in full on or about December 6, 2013, for $368.94.

97.    The interest rate for the subject loan exceeded the maximum interest rate allowed in Maryland pursuant to Md. Code, Com. Law § 12-103, which is 24 percent.

98.    In fact, "CashTaxi.com" acknowledges publicly that the minimum APR on its loan is 599.12%.

99.    On information and belief, "CashTaxi.com" conditioned the extension of credit on repayment by means of preauthorized electronic fund transfers.

100.   Since Defendant NDG lacked a license to lend in Maryland, and because the loans are usurious, this loan is void and unenforceable.

### d.    MobiLoans

101.    Defendant MobiLoans claims to be a tribal lending entity wholly owned by the Tunica-Biloxi Tribe of Louisiana.

102.    On information and belief, Defendant MobiLoans does not provide for the autonomy and economic development of the Tunica-Biloxi Tribe of Louisiana.

103.    On information and belief, Defendant MobiLoans is not operated or controlled by the Tunica-Biloxi Tribe of Louisiana.

104.    On information and belief, Defendant MobiLoans does not hold property in its own name. Nor is it closely linked through the governance structure of the Tunica-Biloxi Tribe of Louisiana. The entity is legally separate and distinct from the Tunica-Biloxi Tribe of Louisiana.

105.    On information and belief, no federal Indian law policy intended to promote tribal self-determination is furthered through the existence of Defendant MobiLoans.

106.    Defendant MobiLoans knows that it does not have a license to make loans in Maryland pursuant to either Md. Code, Fin. Inst. §§ 11-204 or 11-302.

107.    On or about October 28, 2013, Plaintiff Alicia Everette made a payment on a payday loan she obtained from Defendant MobiLoans.

108.    This payment was made from Alicia Everette's home in Maryland.

109.    Alicia Everette previously entered into this payday loan agreement in Maryland.

110.    Plaintiff's loan was for approximately $600 dollars. However, due to usurious finance charges, her balance as of her last payment was approximately $1,013.

111.    The interest rate for the subject loan exceeded the maximum interest rate allowed in Maryland pursuant to Md. Code, Com. Law § 12-103, which is 24 percent.

112.    On information and belief, Defendant MobiLoans conditioned the extension of credit on repayment by means of preauthorized electronic fund transfers.

113.    Since Defendant MobiLoans lacked a license to lend in Maryland, and because the loans are usurious, this loan is void and unenforceable.

**e.    Riverbend Cash**

114.    "Riverbend Cash" a/k/a "Riverbend Finance" is purportedly owned and operated by Defendant Riverbend, which is allegedly a Native American owned business organized under the laws of the Fort Belknap Indian Community.

115.    However, Defendant Riverbend does not appear as a tribal business on the Fort Belknap Indian Community's website, http://www.ftbelknap.org/news.html, nor does it appear anywhere on that website.

116.    On information and belief, Defendant Riverbend does not provide for the autonomy and economic development of the Fort Belknap Indian Community.

117.    On information and belief, Defendant Riverbend is not operated or

controlled by the Fort Belknap Indian Community.

118.   On information and belief, Defendant Riverbend does not hold property in its own name. Nor is Defendant Riverbend closely linked through the governance structure of the Fort Belknap Indian Community. The entity is legally separate and distinct from the Fort Belknap Indian Community.

119.   On information and belief, no federal Indian law policy intended to promote tribal self-determination is furthered through the existence of Defendant Riverbend.

120.   Defendant Riverbend does not have a license to make loans in Maryland pursuant to either Md. Code, Fin. Inst. §§ 11-204 or 11-302.

121.   During 2013, Plaintiff Alicia Everette obtained a payday loan from Defendant Riverbend in Maryland.

122.   The interest rate for the subject loan exceeded the maximum interest rate allowed in Maryland pursuant to Md. Code, Com. Law § 12-103, which is 24 percent.

123.   On information and belief, Defendant Riverbend conditioned the extension of credit on repayment by means of preauthorized electronic fund transfers.

124.   Plaintiff obtained this loan in Maryland by using a computer in Maryland to access the interactive website for "Riverbend Cash," www.riverbendcash.com. This website has online loan applications, customer login, and allows users to engage in online chat with representatives.

125.   The website fails to conspicuously disclose that Defendant Riverbend is subject to sovereign immunity. At the bottom of each website, hidden in small and obscure fine print, is a disclosure that Defendant Riverbend does business as Riverbend Cash and that it is a Native American owned business organized under the laws of the Fort Belknap Indian Community. If one were to click through enough links on Defendant Riverbend's website, one may eventually find in small print a reference to tribal sovereign immunity at the bottom of an FAQ under "What does it mean to do business with a tribal company such as Riverbend Finance, LLC?"

126.   Between September 27, 2013, and December 13, 2013, Plaintiff paid a total of $251.25 on this loan.

127.   On or about December 19, 2013, Plaintiff was then rolled into another usurious payday loan of $500.

128.   Since Defendant Riverbend lacked a license to lend in Maryland, and because the loans are usurious, this loan is void and unenforceable.

## **CLASS ALLEGATIONS**

129.   Plaintiff brings this action on behalf of a class consisting of the all natural persons in the State of Maryland allegedly obligated on a loan obtained from Action PayDay, Bottom Dollar PayDay, AmeriLoan, United Cash Loans, CashTaxi.com, MobiLoans, or Riverbend Cash at any time between May 1, 2012, and May 1, 2015.

130.   The identities of all class members are readily ascertainable from the

records of Defendants.

131.   Excluded from the class are all managers and directors of Defendants and members of their immediate families, and legal counsel for either side and all members of their immediate families.

132.   This action has been brought and may properly be maintained as a class action pursuant to the provisions of Md. R. 2-231 because there is a well-defined community of interest in the litigation:

a.   ***Numerosity:*** The class is so numerous that joinder of all members is impractical. On information and belief there are likely several hundred members in the class.

b.   ***Common Questions Predominate:*** There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. The principal issues are:

i.   Whether Defendants' lacked licenses to make loans in Maryland pursuant to either Md. Code, Fin. Inst. §§ 11-204 or 11-302.

ii.   Whether Defendants' loans exceeded the maximum interest rate allowed in Maryland pursuant to Md. Code, Com. Law § 12-103, which is 24 percent;

iii.   Whether Defendants' loans are void;

iv.   Whether Defendants' usurious and unlicensed loans violated the Maryland Consumer Protection Act;

v.      Whether Defendants' attempts to collect the subject loans violated the Maryland Consumer Debt Collection Act;

vi.      Whether Defendants' conditioned the extension of credit on repayment by means of preauthorized electronic fund transfers in violation of the Electronic Fund Transfer Act; and

vi.      Whether Defendants' are entitled to tribal sovereign immunity.

c.      ***Typicality:*** Plaintiff's claims are typical of the claims of the members of the plaintiff class. Plaintiff and all members of the plaintiff class have claims arising out of Defendants' common course of conduct complained of herein.

d.      ***Adequacy:*** Plaintiff will fairly and adequately protect the interests of the members of the class. Plaintiff is committed to vigorously litigate this matter. Plaintiff has retained counsel experienced in handling class claims and claims involving unlawful collection practices. Neither of the Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this claim.

e.      ***Superiority:*** A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members would be impracticable. Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary

duplication of effort and expense that numerous individual actions would engender. Furthermore, since individual class member's claims for damages are relatively modest, the expenses and burdens of litigating individual actions would make it difficult or impossible for individual members of the class to redress the wrongs done to them. An important public interest will be served by addressing the matter as a class action, substantial economies to the litigants and to the judicial system will be realized, and the potential for inconsistent or contradictory adjudications will be avoided.

133. Certification of the class under Rule 2-231(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. The questions of law and fact common to the members of the class predominate over any questions affecting an individual member.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**COUNT I**
**Declaratory Judgment**
**Md. Code, Cts. & Jud. Proc. §§ 3-406 & 3-409**

134. Plaintiff incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

135. Pursuant to the Maryland Consumer Loan Law ("MCLL"), at Md. Code Ann., Com. Law ("CL") § 12-301, *et seq.*, and Fin. Inst. ("FI") § 11-201 *et seq.*, the Maryland Commissioner of Financial Regulation is responsible for licensing persons who make consumer loans to residents of the State of

Maryland.

136.   Pursuant to FI § 11-204, "[u]nless a person is licensed by the Commissioner, the person may not: (1) [m]ake a loan; or (2) [i]n any way use any advantage provided by the Maryland Consumer Loan Law."

137.   Pursuant to CL § 12-302, a "persons may not engage in the business of making loans under this subtitle unless the person is licensed under or is exempt from the licensing requirements of Title 11, Subtitle 2 of the Financial Institutions Article, Annotated Code of Maryland, known as the Maryland Consumer Loan Law – Licensing Provisions."

138.   Pursuant to FI § 11-302, a person may not make an installment loan under § 12-103(a)(3) or (c), Title 12, Subtitle 9, or Title 12, Subtitle 10 of the Commercial Law Article.

139.   Defendants were not so licensed under either statute.

140.   As a result, Plaintiff maintains that her loans with respect to each Defendant are void and unenforceable.

141.   All Defendants maintain that they are entitled to collect the subject loans.

142.   Thus, there exists an actual controversy of a practicable issue within the jurisdiction of this Court involving the rights and liabilities of the parties with respect to the subject loans.

143.   Accordingly, this Court has jurisdiction to issue a declaratory judgment resolving the dispute pursuant to Md. Code, Cts. & Jud. Proc. §§ 3-406

& 3-409.

## COUNT II
## USURY
### Md. Code Ann., Com. Law, § 12-101, *et seq.*

144.   Plaintiff incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

145.   Despite its lack of either a Consumer Loan Law or Installment Loan Law license, Defendants have applied the majority of payments received from Plaintiff to interest and other costs.

146.   In addition, Defendants have charged an interest rate of far in excess of the legal limit of 24 percent pursuant to Md. Code, Com. Law § 12-103.

147.   Pursuant to Md. Code, Com. Law § 12-114(a), Defendants must forfeit to Plaintiff and the class she seeks to represent three times the amount of interest and charges collected in excess of the permitted amount.

## COUNT III
## Violation of the Maryland Consumer Debt Collection Act
### Md. Code Ann., Com. Law, § 14-201, *et seq.*

148.   Plaintiff incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

149.   Defendants violated § 14-202(8) of the MCDCA by attempting to collect the subject debt with knowledge that the right did not exist. Specifically, Defendants attempted to collect the illegal and usurious subject loans when they knew they were not licensed under either the Consumer Loan Law or Installment Loan Law. In addition, these Defendants knowingly collected interest on the

subject loans far in excess of Maryland's 24 percent legal limit.

150.   As a direct consequence of the acts, practices and conduct of Defendants, Plaintiff and the class she seeks to represent suffered economic loss.

**COUNT IV**
**Violation of the Maryland Consumer Protection Act**
**Md. Code Ann., Com. Law, § 13-101, *et seq*.**

151.   Plaintiff incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

152.   Plaintiff is a consumer as defined by the MCPA, Md. Code Ann., Com. L. § 13-101(c).

153.   Section 13-303 of the CPA prohibits unfair or deceptive trade practices in the collection of consumer debt.

154.   Under § 13-301(14)(iii) of the MCPA, unfair or deceptive trade practices also include any violation of the MCDCA.

155.   Under § 13-301(3) of the MCPA, unfair or deceptive trade practices also include failure to state a material fact if the failure deceives or tends to deceive. Here, Defendants' decision to make an illegal unlicensed loans to Plaintiff without disclosing the fact that these Defendants could not make such loans without a license deceived Plaintiff into thinking the subject loans were legal and legitimate loans.

156.   As a direct consequence of the acts, practices and conduct of Defendants, Plaintiff and the class she seeks to represent suffered economic loss.

## COUNT V
## Violation of the Electronic Fund Transfer Act
## 15 U.S.C. § 1693, *et seq.*

157.   Plaintiff incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

158.   Pursuant to 15 U.S.C. § 1693k(1) "no person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."

159.   On information and belief, each Defendant conditioned the extension of credit to Plaintiff on such consumer's repayment by means of preauthorized electronic fund transfers.

160.   15 U.S.C. § 1693m provides that "any person who fails to comply with any provision of this subchapter with respect to any consumer," shall be liable to Plaintiff and the class she seeks to represent for any actual damage sustained by the consumer as the result of the failure to comply with EFTA; statutory damages in an amount of not less than $100 nor greater than $1,000; costs of this action and a reasonable attorney's fee as determined by the court.

161.   By way of this action, Plaintiff and the class she seeks to represent suffered actual damages, and seek statutory damages, costs of suit and attorneys' fees.

WHEREFORE, Plaintiff, Alicia Everette, respectfully request the following relief:

a.  An order certifying this lawsuit as a class action, appointing the Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

b.  A declaratory judgment that the subject loans are void and unenforceable; and

c.  A judgment against Defendants for actual damages pursuant to Md. Code. Ann., Com. Law. § 14-203, Md. Code Ann., Com. Law § 13-408, and to 15 U.S.C. § 1693m(a)(1) in an amount at this time estimated to be in excess of $75,000.00;

d.  A judgment against Defendants for statutory damages pursuant to 15 U.S.C. § 1692m(a)(2)(A);

e.  A judgment against Defendants for three times the interest and charges collected in excess of the interest charges authorized by Md. Code, Com. Law § 12-114, an amount at this time estimated to be in excess of $75,000.00;

f.  An award of costs of litigation and reasonable attorney's fees pursuant to 15 U.S.C. § 1692m(a)(3) and Md. Code Ann., Com. Law § 13-408; and

g.  Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues in this action, except for any issues relating to the amount of attorneys' fees and litigation costs to be awarded should Plaintiff prevail on any of his claims in this action.

Dated: May 1, 2015                     Respectfully Submitted,


/s/ E. David Hoskins
E. David Hoskins, Esq., No. 06705
THE LAW OFFICES OF E. DAVID HOSKINS, LLC
16 East Lombard Street, Suite 400
Baltimore, Maryland 21202
(410) 662-6500 (Tel.)
davidhoskins@hoskinslaw.com



/s/ Max F. Brauer
Max F. Brauer, Esq., No. 11306
THE LAW OFFICES OF E. DAVID HOSKINS, LLC
16 East Lombard Street, Suite 400
Baltimore, Maryland 21202
(410) 662-6500 (Tel.)
maxbrauer@hoskinslaw.com